POTTER HANDY LLP
Mark Potter, Esq., CA SBN 166317
Russell Handy, Esq., CA SBN 195058
Naomi Butler, Esq. CA SBN 332664
Cara Townsend, Esq., CA SBN 220356
100 Pine Street, Ste 1250
San Francisco, CA 94111
Phone: (415) 534-7970;
Email: ServeHT@potterhandy.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**Jane Doe (UB-00001)**

Plaintiff,

v.

**Uber Technologies, Inc.**

DOES 1-10,

Defendants

Case No.

**Complaint for Damages:**

**18 U.S.C. § 1595**

**Demand for Jury Trial**

# PLAINTIFF'S COMPLAINT

## INTRODUCTION

1. Plaintiff, Jane Doe UB-00001, files this civil lawsuit to seek compensation for the harms and losses she sustained as a result of being a victim of sex trafficking that occurred when she was 17 years old.
2. During the relevant period, Plaintiff was repeatedly transported by rideshare services operated by Defendant to locations where she was subjected to illegal sex trafficking orchestrated by Plaintiff's trafficker.
3. Defendant's platform did not merely provide neutral transportation. It operated under policies and incentive structures that encouraged drivers to complete rides even where clear policy violations and indicators of risk were present.
4. As alleged herein, Defendant's own rules prohibited transporting unaccompanied minors and required drivers to ensure that the rider matched the account holder. Yet Defendant designed and enforced its system in a manner that discouraged drivers from declining or cancelling such rides.
5. Defendant's platform provided a critical logistical component of this sex trafficking enterprise by enabling the repeated and efficient transportation of Plaintiff and furthered an unlawful enterprise.
6. Despite numerous observable indicators of harm and exploitation, Defendant failed to implement reasonable safeguards or take action to prevent continued injury.

## PARTIES

7. Plaintiff is a resident of Richmond, Virginia.[1]
8. Defendant Uber Technologies, Inc. is headquartered in San Francisco, California.

---

[1] Contemporaneously with the filing of this Complaint, Plaintiff is filing a Motion to Proceed Anonymously based on the inherently intimate and personal nature of the allegations. Plaintiff will provide her identity to counsel for the defendants upon entry of a protective order.

9. The true names and capacities of Defendants DOES 1–10 are persons or entities whose true names, identities, and forms are currently unknown to Plaintiff. Plaintiff is informed and believes, and thereupon alleges, that each of the fictitiously named Defendants DOES 1–10 is responsible for the conduct alleged in this Complaint and that, through their conduct, these fictitiously named Defendants actually and substantially caused Plaintiff's injuries and damages.
10. Defendant Uber Technologies, Inc. is a common carrier within the meaning of California Civil Code § 2168, as it transports passengers for hire and holds itself out to the public as providing transportation services. As a common carrier, Defendant owed Plaintiff the highest duty of care under California Civil Code § 2100, including a duty to exercise utmost care and diligence for her safety. This heightened duty required Defendant to take reasonable measures to identify, prevent, and respond to foreseeable risks of harm, including the use of its platform to facilitate the exploitation of vulnerable or underage individuals.

## JURISDICTION AND VENUE

11. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA, 18 USC 1595.
12. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.
13. Venue is proper in this District under 28 U.S.C. § 1391 because Defendant maintains its principal place of business in this District and relevant platform decisions were made here.

## SEX TRAFFICKING OVERVIEW

14. Human trafficking is a widespread and heinous crime that has deeply scarred the moral fabric of society. Often referred to as modern-day slavery, it represents a severe public health crisis of epidemic proportions. This exploitation disrupts

communities, drives criminal activity, and devastates countless families. Each year, millions of people are trafficked across the globe, including within and into the United States.

15. One of the most harmful and destructive forms of human trafficking is sex trafficking. This involves using force, fraud, or coercion to force an individual into engaging in commercial sex acts. Even if no force, fraud, or coercion is involved, the exploitation of a minor for commercial sex is human trafficking.

16. Sex trafficking represents a large part of global human trafficking and is the predominant form of transnational modern-day slavery. It is estimated that 4.8 million people are victims of sex trafficking worldwide, with the United States being the leading country in driving demand.

17. Women and girls are disproportionately impacted by this modern form of involuntary servitude, making up 99% of victims in the commercial sex industry. Within the realm of sex trafficking, children are undoubtedly the most vulnerable. According to research from the Polaris Project, the average age at which sex trafficking begins is during adolescence, though disturbingly, it can start as early as infancy.

18. In 2018, more than half (51.6%) of active criminal human trafficking cases in the United States involved sex trafficking of children only. According to the National Center for Missing and Exploited Children, reports of suspected child sex trafficking increased by 846 percent between 2010 and 2015. A survey found that in 2015, 55 percent of minors who became victims of sex trafficking met their traffickers through a website or mobile app. Increasingly, predators use the internet and social media to identify, target, and exploit vulnerable children.

19. The harms suffered by victims of sex trafficking are profound and extensive. Victims are routinely subjected to sexual violence, physical abuse, and repeated criminal exploitation, often by multiple offenders. They are frequently forced to endure extreme physical deprivation, including inadequate food, sleep, and

medical care, and are exposed to serious health risks such as HIV/AIDS, hepatitis, and substance dependency. Psychological consequences are pervasive and severe, including depression, post-traumatic stress disorder, anxiety, and persistent fear. Survivors often experience cognitive and memory impairments, engage in self-destructive behaviors, and face social marginalization that intensifies the lasting impact of their victimization.

20. Traffickers employ illicit schemes, intricate networks of corporate entities, and rapidly evolving technologies to carry out their operations. More than a decade ago, human trafficking was identified as the third largest and fastest-growing criminal enterprise worldwide, driven by the combination of high profits and relatively low risk.

21. Human trafficking produces an estimated $150 billion in profits each year, approximately two-thirds of which stem from the sexual exploitation of trafficked individuals.

22. While traditional trafficking methods persist, online technologies now give traffickers an unprecedented ability to exploit larger numbers of victims and advertise across geographic boundaries. The rise of online exploitation has fundamentally transformed the commercial sex trade. Where buyers once had to leave their homes to engage in in-person transactions, the internet now enables remote access and anonymity. Online advertising has reshaped the commercial sex market and, in doing so, has contributed significantly to the growth of domestic sex trafficking.

23. The exploitation of sex trafficking victims is not confined to traffickers and sex buyers alone; rather, human trafficking enterprises rely on the participation of ostensibly legitimate businesses to operate effectively. Traffickers understand that the viability of their operations often depends on access to and affiliation with mainstream commercial enterprises. When such businesses place profits above human welfare and become complicit, they facilitate continued exploitation and

enable traffickers to adapt, innovate, and expand methods for profiting from the exploitation of human beings.

24. There is little question that sex trafficking operations cannot succeed without the assistance, support, or facilitation of other business organizations. Human trafficking is therefore accurately understood as a criminal enterprise that relies on mainstream commercial partners to flourish.

25. In recent years, traffickers have increasingly relied on a broad array of willing accomplices, including ostensibly legitimate businesses that knowingly profit from commercial relationships with trafficking ventures they know—or reasonably should know—are associated with the exploitation and misuse of human beings.

26. Private-sector involvement in human trafficking is pervasive. Traffickers utilize lodging establishments to house victims and carry out forced commercial sex acts, rely on financial institutions to process and launder proceeds, use ride-share companies to transport victims and deliver their sexual exploitation, and internet and social media platforms to recruit victims and market their services. Technological advancements in computing, software, and digital infrastructure further enable trafficking enterprises and enhance their profits.

27. Addressing the widespread growth of human trafficking requires accountability for those who knowingly profit from participation in ventures that a reasonable person knew or should have known were engaged in human enslavement. Civil litigation, therefore, serves as a critical tool in any comprehensive approach to combating sex trafficking in America.

## STATEMENT OF FACTS

**Plaintiff was Trafficked**

28. Plaintiff experienced a vulnerable upbringing and, as a minor, became susceptible to exploitation.

29. At approximately 17 years old, Plaintiff came under the control of an individual (the "Trafficker") who directed her movements and activities.
30. The Trafficker arranged encounters with third parties and controlled Plaintiff's communications and movement.
31. Plaintiff was advertised online under an alias controlled by the Trafficker to generate demand for these encounters.
32. The unlawful enterprise operated through a recurring pattern of solicitation, transportation, and repeated exploitation.

**Use of Defendant's Platform**

33. Defendant's rideshare platform was used in approximately 80% of Plaintiff's transportation during the relevant period.
34. Plaintiff did not request or control these rides.
35. Instead, the Trafficker—an adult male—arranged and paid for rides using accounts on Defendant's platform.
36. Drivers were routinely dispatched to pick up Plaintiff even though she was not the account holder.
37. Plaintiff was transported dozens to hundreds of times to lodging locations.
38. These rides frequently occurred at night and often involved repeated trips within short time periods.

**Violations of Defendant's Policies**

39. At all relevant times, Defendant maintained policies prohibiting the transportation of unaccompanied minors and the use of accounts by individuals other than the account holder.
40. Defendant required drivers to confirm rider identity and decline noncompliant rides
41. In Plaintiff's case, these policies were routinely violated.

42. Drivers knew or should have known that: Plaintiff was a minor traveling alone; Plaintiff was not the account holder; and the rides had been arranged by a third party.
43. Despite these violations, drivers completed rides and transported Plaintiff.

**Driver Incentives and Algorithmic Pressure**

44. Defendant structured its platform to incentivize drivers to accept and complete rides, even when policy violations were apparent.
45. Drivers who cancelled rides risked:
    - losing compensation for the trip;
    - negative impacts on performance metrics;
    - reduced access to future ride assignments;
    - deprioritization by dispatch algorithms
46. Defendant tracked cancellation rates and used them in allocating future ride opportunities.
47. These systems created economic and operational pressure on drivers to proceed with rides rather than cancel them, even where policy violations existed.
48. As a result, Defendant effectively encouraged drivers to disregard policy violations, including those involving minors and mismatched account holders.

**2014-2016 Platform Design and Policy Context**

49. During the relevant time period, Defendant emphasized rapid ride acceptance and completion as key performance metrics.
50. Drivers were evaluated based on acceptance rates, cancellation rates, and responsiveness.
51. Drivers with higher cancellation rates faced reduced ride opportunities and lower priority within the platform.

52. Defendant’s platform did not require meaningful identity verification of riders at pickup.
53. Defendant did not implement effective safeguards to prevent third-party ride arrangements involving minors.

**Observable Indicators During Rides**

54. During rides, drivers observed circumstances that would raise concern to a reasonable person.
55. Plaintiff was obviously a minor, was dressed scantily with any eye toward sexualized presentation, traveled alone at late hours, and was transported to short-term lodging locations.
56. Drivers' comments indicated that they often knew or suspected that inappropriate conduct was taking place.
57. Plaintiff exhibited signs of distress on multiple occasions.
58. Despite these indicators, drivers continued transporting Plaintiff without escalation or reporting.

**Defendant’s Knowledge**

59. Defendant collected detailed ride data, including identity, location, timing, and ride patterns.
60. Defendant knew or should have known that: rides were arranged by third parties; a minor was being transported repeatedly; rides followed recurring high-risk patterns.
61. Defendant failed to act on this information.
62. Defendant continued to profit from these rides.

**Internal Policies, Metrics, and Corporate Awareness**

63. On information and belief, during the relevant time period, Defendant maintained internal policies, training materials, and operational guidance addressing rider safety, account integrity, and driver performance metrics.

64. On information and belief, Defendant tracked and internally analyzed driver performance using metrics including acceptance rates, cancellation rates, ride completion rates, and responsiveness.

65. On information and belief, Defendant used these metrics to evaluate drivers and to allocate ride opportunities through its dispatch system.

66. On information and belief, drivers who cancelled rides—regardless of reason—were subject to negative impacts on these metrics, which in turn affected their ability to receive future ride assignments.

67. On information and belief, Defendant was aware that this performance-based system discouraged drivers from cancelling rides, including in circumstances involving policy violations or rider safety concerns.

68. On information and belief, Defendant maintained internal guidance instructing drivers to avoid cancelling rides except in limited circumstances, and to prioritize ride completion.

69. On information and belief, Defendant did not provide drivers with clear, enforceable mechanisms to verify rider identity at pickup or to confirm that the rider matched the account holder.

70. On information and belief, Defendant was aware that its platform permitted frequent use of accounts by third parties and did not consistently enforce restrictions against such use.

71. On information and belief, Defendant maintained internal data reflecting: repeated use of the same accounts to transport different riders; frequent transportation to and from short-term lodging locations; recurring late-night ride patterns; and clusters of rides consistent with commercial activity.

72. On information and belief, Defendant analyzed or had the capability to analyze such data and identify anomalous or high-risk patterns.
73. On information and belief, Defendant was aware that its platform was being used in connection with unlawful exploitation, including involving minors, prior to and during the time Plaintiff was transported.
74. On information and belief, Defendant received external information—including public reports, complaints, or internal escalations—regarding misuse of its platform for unlawful or exploitative purposes.
75. On information and belief, despite this awareness, Defendant did not implement effective safeguards sufficient to detect, prevent, or disrupt such activity.
76. On information and belief, Defendant's officers, directors, and managing agents were aware of these risks and the limitations of existing safeguards.
77. On information and belief, Defendant made deliberate decisions regarding platform design, driver incentives, and enforcement priorities that favored ride volume and growth over stricter safety enforcement.

**Conscious Disregard Supporting Punitive Damages**

78. Defendant had advance knowledge of the risks that its platform could be used to facilitate unlawful exploitation, including involving vulnerable and underage individuals.
79. Despite this knowledge, Defendant failed to implement reasonable and available safeguards, including: meaningful identity verification mechanisms; enforcement of restrictions on unaccompanied minors; effective detection of repeated third-party ride arrangements; intervention protocols for high-risk ride patterns.
80. Defendant maintained and enforced performance metrics and incentive structures that discouraged drivers from cancelling rides, even where policy violations or safety concerns were apparent.

81. Defendant knew that these systems would predictably result in drivers completing rides under unsafe or noncompliant conditions.

82. Defendant's failure to modify these systems, despite known risks, constituted a conscious disregard for the safety of riders, including Plaintiff.

83. Defendant's conduct was not inadvertent but resulted from corporate-level decisions regarding platform design, incentives, and enforcement priorities.

84. On information and belief, Defendant's officers, directors, and managing agents authorized, ratified, or were deliberately indifferent to the conduct described herein.

85. Defendant's actions were carried out with willful and conscious disregard of the rights and safety of others.

**Industry Knowledge, Public Reports, And Prior Incidents**

86. On information and belief, prior to and during the relevant time period, the risk that transportation services—including rideshare platforms—could be used in connection with unlawful exploitation was widely recognized.

87. Publicly available materials from governmental bodies and nonprofit organizations described transportation as a recurring component of trafficking operations and identified transportation providers as businesses that regularly intersect with traffickers, victims, and survivors.

88. By way of example, the U.S. Senate Permanent Subcommittee on Investigations issued its January 2017 report, "Backpage.com's Knowing Facilitation of Online Sex Trafficking," following a bipartisan investigation into how traffickers used online systems to facilitate trafficking. That report described the commercial ecosystem surrounding trafficking activity and noted that Backpage was implicated in a substantial share of suspected child-trafficking reports received by NCMEC.

89. On information and belief, that report reinforced what was already publicly apparent during the relevant period: trafficking operations often depended on interconnected commercial services, including advertising, lodging, communications, payment systems, and transportation. This allegation does not assert that the Senate report specifically analyzed Defendant's platform, but rather that the report reflects the broader public understanding that legitimate service providers can become part of the infrastructure through which trafficking is carried out.

90. Publicly available materials from Polaris likewise identified transportation as an essential system used to move individuals to and between trafficking locations and emphasized that private-sector transportation providers can help prevent, detect, and disrupt trafficking through targeted policies and training.

91. Polaris's transportation-sector guidance identified reasonable anti-trafficking measures for transportation providers, including policies prohibiting the use of company services to facilitate trafficking, training personnel on indicators and reporting, and implementing procedures tailored to the transportation context.

92. On information and belief, these and similar materials described indicators relevant to transportation providers, including transportation arranged by third parties, repeated late-night trips, frequent travel to short-term lodging locations, and patterns involving multiple trips within short periods.

93. On information and belief, such materials were publicly available and accessible to companies operating transportation platforms, including Defendant, during or by the close of the relevant period.

94. On information and belief, Defendant was aware of, or at a minimum had access to, public guidance and reporting of this kind through its operations, safety functions, industry engagement, and public-facing activities.

95. On information and belief, the existence of these materials made it foreseeable that a transportation platform lacking effective safeguards for unaccompanied minors,

third-party-arranged rides, repeated motel drop-offs, and suspicious ride patterns could be used in connection with unlawful exploitation.

**Prior Incidents Involving Defendant's Platform**

96. On information and belief, prior to and during the time Plaintiff was transported, Defendant's platform had been used in other instances involving unlawful or exploitative conduct.

97. On information and belief, Defendant received complaints, reports, or internal escalations relating to rides involving vulnerable individuals or suspicious circumstances.

98. On information and belief, such reports included situations involving: riders who appeared underage; transportation arranged by individuals other than the rider; repeated trips to short-term lodging locations; and riders exhibiting signs of distress.

99. On information and belief, Defendant maintained internal systems capable of tracking such reports and identifying patterns across rides, drivers, and accounts.

100. On information and belief, Defendant had the ability to correlate such reports with ride data, including locations, timing, and account usage patterns

101. On information and belief, despite this information, Defendant did not implement effective measures sufficient to detect or prevent repeated high-risk transportation patterns.

**Industry Standards and Reasonable Safeguards**

102. On information and belief, public guidance from organizations such as Polaris Project and similar entities identified reasonable measures for transportation providers, including: enforcing restrictions on unaccompanied minors; verifying that riders correspond to account holders; monitoring for repeated high-risk ride

patterns; implementing reporting and escalation protocols; and providing training to identify vulnerable riders.

103. On information and belief, such measures were feasible and consistent with standard safety practices for companies engaged in transporting individuals.

104. On information and belief, Defendant either failed to implement these measures or implemented them in a manner that was ineffective due to competing incentives and design choices.

**Foreseeability and Corporate Awareness**

105. On information and belief, the combination of: publicly available reports and industry guidance; prior incidents on Defendant's platform; internal data and reporting systems; and observable ride patterns made the risk of harm to individuals such as Plaintiff foreseeable to Defendant.

106. On information and belief, Defendant's officers, directors, and managing agents were aware of these risks and the limitations of existing safeguards.

107. On information and belief, Defendant nevertheless continued to operate its platform without implementing sufficient protections.

108. On information and belief, Defendant's failure to act in the face of known risks reflects a conscious disregard for the safety of vulnerable individuals.

## APPLICABILITY OF THE COMMUNICATIONS DECENCY ACT (47 U.S.C. § 230)

109. Plaintiff's claims arise from Defendant's own conduct in designing, operating, and profiting from a transportation platform that was repeatedly used to facilitate unlawful activity.

110. Plaintiff does not seek to hold Defendant liable as the publisher or speaker of third-party content within the meaning of Section 230.

111. Plaintiff's claims are based on Defendant's independent acts and omissions, including: providing transportation services integral to the unlawful venture; failing to implement reasonable safeguards despite foreseeable risks; failing to act on observable indicators of harm; and profiting from repeated transactions connected to the conduct at issue.

112. The conduct at issue is non-expressive and does not depend on the publication, display, or moderation of third-party content.

113. Plaintiff's claims, therefore, do not treat Defendant as a publisher or speaker of information provided by another content provider.

114. In addition, Plaintiff's federal claim arises under 18 U.S.C. § 1595, which falls within the statutory exception to immunity provided by 47 U.S.C. § 230(e)(5).

115. To the extent Defendant relies on § 230 as a defense, such reliance is misplaced because: Plaintiff's claims are grounded in Defendant's own conduct, not third-party content; the alleged wrongdoing involves offline services and real-world activity; and Congress has expressly limited § 230 immunity in the context of trafficking-related claims.

116. Accordingly, § 230 does not bar Plaintiff's claims.

117. Plaintiff's claims arise from Defendant's role in providing real-world transportation services and not from any publication of third-party content, further placing these claims outside the scope of Section 230 immunity.

## FIRST CAUSE OF ACTION: TVPRA

Trafficking Victims Protection Reauthorization Act ("TVPRA")

18 U.S.C. § 1595 (against all defendants).

118. The civil remedy provision of the federal human trafficking statute is found at 18 U.S.C. § 1595, and it reads:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter123) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

119. Thus, the federal sex trafficking statute consists of four elements: (a) the defendant(s) knowingly benefited from participation in a venture, (b) from participation in a venture, (c) the venture violated the TVPRA, and (d) the defendant(s) knew or should have known the venture violated the sex trafficking statute.

120. Plaintiff incorporates all preceding paragraphs.

121. Defendant knowingly benefited from participation in a venture that it knew or should have known engaged in violations of 18 U.S.C. § 1591.

122. Defendant participated by: dispatching rides arranged by third parties for a minor; allowing repeated policy violations; and structuring incentives that encouraged completion of such rides.

123. Defendants' transportation services were integral to the trafficking venture and constituted substantial assistance without which the venture could not have operated as carried out.

124. These actions were not passive or incidental but constituted active and continuous participation in a venture that depended on Defendant's transportation services to function.

125. Defendant knew or, at a minimum, recklessly disregarded and consciously avoided learning that its platform was being used in connection with unlawful exploitation through: driver awareness of policy violations; repeated rider/account mismatches; platform data reflecting patterns.

126. Defendant's knowledge is further evidenced by its internal data systems, performance metrics, and awareness of repeated policy violations, as described above, which collectively demonstrate that Defendant knew or should have known that its platform was being used in connection with unlawful activity involving Plaintiff.

127. Defendant's knowledge is further supported by publicly available industry guidance and reports identifying transportation services as a component of unlawful exploitation, which made the risk to Plaintiff foreseeable.

128. As a common carrier owing the highest duty of care to its passengers, Defendant had an obligation to exercise utmost care and diligence for Plaintiff's safety, including identifying and responding to indicators of sex trafficking occurring through its platform. Despite this heightened duty, Defendant knew or, at a minimum, should have known that its services were being used to facilitate unlawful exploitation, yet continued to provide transportation and derive financial benefit from such activity.

129. Defendant knowingly benefited financially from participation in the venture by collecting fees, commissions, and other revenue from each ride arranged and completed through its platform, including rides that facilitated Plaintiff's exploitation.

130. Defendant's financial benefit was directly tied to the volume and completion of rides, including those that facilitated Plaintiff's exploitation.

131. Plaintiff suffered harm as a direct result.

132. Defendant had the ability to identify, disrupt, and prevent the ongoing use of its platform in connection with Plaintiff's exploitation, yet failed to take reasonable steps to do so. This failure enabled the continuation of the trafficking venture and directly contributed to Plaintiff's harm.

133. Defendant's conduct was part of a continuous course of action involving repeated transactions and ongoing facilitation, rather than isolated or incidental involvement.

## PUNITIVE DAMAGES

134. Plaintiff incorporates all preceding paragraphs.

135. Defendant acted with malice, oppression, and fraud within the meaning of California Civil Code § 3294.

136. Defendant's conduct was despicable and carried out with a willful and conscious disregard of the rights and safety of others.

137. Defendant's conduct was intentional, knowing, and carried out in conscious disregard of a high probability of harm to Plaintiff.

138. Defendant's officers, directors, and managing agents authorized, ratified, or were aware of the conduct described herein.

139. On information and belief, Defendant's conscious failure to adopt and enforce reasonable safeguards, despite known risks and publicly available guidance identifying transportation providers as recurring points of intersection with trafficking activity, further demonstrates Defendant's willful and knowing disregard for Plaintiff's safety.

140. Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

Plaintiff prays for judgment to be entered for Plaintiff against Defendants, jointly and severally, for actual, general, special, compensatory, and punitive damages as the evidence may show and the jury may determine to be proper, together with restitution and disgorgement of all ill-gotten gains, costs of suit, prejudgment interest, post-judgment interest, attorneys' fees pursuant to 18 U.S.C. § 1595, and such other

and further relief to which Plaintiff may show herself to be justly entitled, at law or in equity.

**JURY DEMAND**

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury on all the issues so triable.

POTTER HANDY, LLP

Dated: April 17, 2026 By: /s/ Mark Potter .
Mark Potter
Attorneys for Plaintiff